IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No.  2:09-cv-7459 |
| | ) | |
| SHARKCO SEAFOOD | ) | |
| INTERNATIONAL, INC., | ) | **CONSENT DECREE OF PERMANENT** |
| a corporation, | ) | **INJUNCTION** |
| KHAI Q. NGUYEN and TUAN Q. | ) | |
| NGUYEN, individuals, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

Plaintiff, the United States of America, by its undersigned
attorneys, having filed a Complaint for permanent injunctive
relief against Sharkco Seafood International, Inc. ("Sharkco"),
Khai Q. Nguyen, and Tuan Q. Nguyen (collectively, "Defendants"),
and Defendants having appeared and having consented to the entry
of this Consent Decree of Permanent Injunction ("Decree") without
contest and before any testimony has been taken, and the United
States of America having consented to this Decree;

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that:

1.  This Court has jurisdiction over the subject matter and
over all parties to this action.

2.  The Complaint for Permanent Injunction states a cause of
action against Defendants under the Federal Food, Drug, and
Cosmetic Act, 21 U.S.C. § 301 et seq. (the "Act").

3.  Defendants violate 21 U.S.C. § 331(a) by introducing or delivering, or causing to be introduced or delivered, into interstate commerce articles of food, within the meaning of 21 U.S.C. § 321(f) ("food"), namely scombrotoxin-forming fish and fishery products, such as tuna, mahi mahi, blue runner, spanish mackerel, wahoo, king mackerel, and amberjack ("Scombrotoxin Fish Products") that are adulterated within the meaning of 21 U.S.C. § 342(a)(4).  Defendants also violate 21 U.S.C. § 331(k) of the Act by adulterating, or causing the adulteration of, Scombrotoxin Fish Products within the meaning of 21 U.S.C. § 342(a)(4).

4.  Defendants and each and all of their agents, representatives, employees, attorneys, successors, assigns, and any and all persons in active concert or participation with any of them are hereby permanently restrained and enjoined, under the provisions of 21 U.S.C. § 332(a), from processing, preparing, packing, holding, and distributing, at or from Sharkco's processing facility located at 707 Jump-Basin Road, Highway 23 South, Venice, Louisiana 70091 and at or from any other locations at which Defendants process, prepare, pack, hold, and distribute, any Scombrotoxin Fish Products (collectively, the "Sharkco Facility"), unless and until the following has been completed:

A.  Within seven (7) calendar days of the entry of this Decree, Defendants shall select and identify, in writing to FDA, a person ("HACCP Expert"), who is without any personal or

financial ties (other than the consulting agreement) to Defendants or their families and who, by reason of background, experience, and education, is qualified to conduct hazard analyses for processing Scombrotoxin Fish Products, develop adequate written hazard analysis critical control point ("HACCP") plan(s) for the processing of Scombrotoxin Fish Products, ensure proper implementation of HACCP plan(s) for Scombrotoxin Fish Products, develop adequate sanitation standard operating procedures ("SSOPs"), ensure the adequacy of sanitation monitoring procedures and sanitation control records and, further, develop and conduct training regarding Defendants' obligations under 21 C.F.R. Part 123. Defendants represent that, after the United States brought this action, they retained a HACCP Expert. If, after entry of this Decree, Defendants retain a new HACCP Expert, within seven (7) calendar days after such HACCP Expert is retained, Defendants shall notify FDA in writing of the identity and qualifications of the HACCP Expert and provide FDA with information in writing regarding the HACCP Expert's qualifications, background, experience, and/or education as described in this paragraph;

B. Within twenty one (21) calendar days of the entry of this Decree, in accordance with 21 C.F.R. Part 123, the HACCP Expert shall conduct a hazard analysis for the processing of all Scombrotoxin Fish Products that Defendants will or may process

upon resumption of operations, develop adequate written HACCP plan(s) for all Scombrotoxin Fish Products that Defendants will or may process upon resumption of operations and shall develop SSOPs for the Sharkco Facility and shall submit the same in writing to the United States Food and Drug Administration ("FDA"). In addition to the requirements set forth at 21 C.F.R. Part 123, Defendants shall develop written corrective action plans as part of their HACCP plan(s) for Scombrotoxin Fish Products, as described in 21 C.F.R. § 123.7(b). A copy of Defendants' most recent draft HACCP plan(s) and SSOPs, submitted to FDA by Defendants but not yet reviewed by FDA, are attached hereto as Exhibit A;

C. Within sixty (60) calendar days of receipt, FDA will provide either a written notice of no objection to Defendants' HACCP plan(s) and SSOPs or a written explanation of deficiencies identified in the plan(s) and SSOPs. If FDA requires that Defendants must resubmit any HACCP plan(s) or SSOPs to show correction of identified deficiencies, Defendants shall submit any corrected HACCP plan(s) or SSOPs to FDA within ten (10) calendar days of receipt of the written explanation of the identified deficiencies. FDA will review the corrected HACCP plan(s) and SSOPs and provide a written notice of no objection or further explain in writing any new or remaining deficiencies. Defendants shall respond to each written explanation of

deficiencies by FDA within ten (10) calendar days of receipt of the explanation. The HACCP plan(s) and SSOPs ultimately found suitable by FDA through this procedure are referred to hereinafter as Sharkco's HACCP Plan(s) and Sharkco's SSOP;

D. Defendants shall sign and date Sharkco's HACCP Plan(s) as required by 21 C.F.R. § 123.6(d);

E. The HACCP Expert shall train Defendants and Defendants' employees on Defendants' obligations under 21 C.F.R. Part 123 and on how to fully implement Sharkco's HACCP Plan(s) and Sharkco's SSOP;

F. FDA may, as it deems necessary, inspect the Sharkco Facility, including Sharkco's HACCP Plan(s), Sharkco's SSOP, and all records relating to the processing, preparing, packing, holding, and distribution of Scombrotoxin Fish Products. The costs of FDA inspections conducted pursuant to this paragraph (including sampling, testing, travel, document preparation and review time, and subsistence expenses) shall be borne by Defendants at the rates specified in paragraph 16; and

G. FDA shall notify Defendants, in writing, that Defendants appear to be in compliance with all of the requirements specified in paragraph 4(A)-(E) of this Decree, the Act, and all applicable regulations.

5. Upon resumption of operations after completion of the requirements of paragraph 4, Defendants shall have and fully

- 5 -

implement Sharkco's HACCP Plan(s) and Sharkco's SSOP. As required by 21 C.F.R. § 128.8(a)(1), Defendants shall reassess the adequacy of Sharkco's HACCP Plan(s) whenever any changes occur that could affect the hazard analysis or alter Sharkco's HACCP Plan(s) in any way or at least annually.

6. Defendants have represented that they have no Scombrotoxin Fish Products at the Sharkco Facility. Within seven (7) calendar days of the entry of this Decree, Defendants shall certify to FDA in writing that Defendants have no Scombrotoxin Fish Products at the Sharkco Facility or submit to FDA for approval a written destruction plan for all Scombrotoxin Fish Products at the Sharkco facility. Upon approval by FDA of the written destruction plan, Defendants shall, under the FDA's supervision, destroy all Scombrotoxin Fish Products at the Sharkco Facility according to the approved written destruction plan. All expenses of such supervision by FDA shall be paid by Defendants at the rates specified in paragraph 16.

7. Within fifteen (15) calendar days after the entry of this Decree, Defendants shall provide a copy of the Decree, by personal service or by certified mail, return receipt requested, to each and all of Defendants' agents, representatives, employees, attorneys, successors, assigns, and any and all persons in active concert or participation with any of them.

Defendants shall also post a copy of this Decree in the employee common areas at the Sharkco Facility.

8.   Within twenty (20) calendar days after the entry of this Decree, Defendants shall provide the Director, FDA New Orleans District Office, at the address set forth in paragraph 19, and plaintiff's attorneys, an affidavit, from a person with personal knowledge of the facts stated therein, stating the fact and manner of Defendants' compliance with paragraph 7, and identifying the names and positions of all persons who were notified pursuant to paragraph 7.

9.   Upon entry of the Decree, Defendants shall, within ten (10) calendar days of employment of any new employee, provide a copy of the Decree, by personal service or by certified mail, return receipt requested, to each new employee hired by Defendants.

10.   After Defendants receive written notification from FDA as specified in paragraph 4(G) above, Defendants and each and all of their agents, representatives, employees, attorneys, successors, assigns, and any and all persons in active concert or participation with any of them are permanently restrained and enjoined from directly or indirectly doing or causing to be done any of the following acts:

A.   Introducing or delivering for introduction, or causing the introduction or delivery for introduction, into interstate

commerce any Scombrotoxin Fish Products that are adulterated within the meaning of 21 U.S.C. § 342(a)(4);

B. Causing any Scombrotoxin Fish Products to become adulterated, within the meaning of 21 U.S.C. § 342(a)(4), while such food is held for sale after shipment in interstate commerce; and

C. Failing to implement and continuously maintain the requirements of this Decree.

11. Representatives of FDA shall be permitted, without prior notice and as and when FDA deems necessary, to make inspections of the Sharkco Facility, or of any new location(s) at which Defendants process, prepare, pack, hold, and distribute Scombrotoxin Fish Products, and, without prior notice and as and when FDA deems necessary, to take any other measures necessary to monitor and ensure continuous compliance with the terms of this Decree. Such inspections may, at FDA's discretion, include the taking of photographs and samples and the examination and copying of all records that relate to the processing, preparing, packing, holding, and distribution of Scombrotoxin Fish Products. Such inspections shall be permitted upon presentation of a copy of this Decree and appropriate credentials. Such inspection authority granted by this Decree is apart from, and in addition to, the authority to make inspections under the Act, 21 U.S.C. § 374.

12. Defendants shall promptly provide any information or records to FDA regarding the processing, preparing, packing, holding, and distribution of Scombrotoxin Fish Products upon request. Defendants shall maintain copies of their HACCP plans, and all records required by their HACCP plans and 21 C.F.R. Part 123, at the Sharkco Facility in a location where they are readily available for reference and inspection by FDA representatives. All records required to be kept by the HACCP plans and by regulation shall be retained for at least three (3) years after the date they are prepared and shall be presented immediately to FDA investigators upon request.

13. A. If, at any time after entry of this Decree, FDA determines, based on the results of an inspection, analysis of a sample or samples, or other information, that Defendants, in processing, preparing, packing, holding, or distributing Scombrotoxin Fish Products, have failed to comply with any provision of this Decree, have violated the Act, or FDA regulations, or that additional corrective actions are necessary to achieve compliance with this Decree, the Act, or FDA regulations, FDA may, as and when it deems necessary, order Defendants in writing to take appropriate action, including, but not limited to, ordering Defendants immediately to take one or more of the following actions:

1. Cease processing, preparing, packing, holding, and distributing Scombrotoxin Fish Products;

2. Recall all Scombrotoxin Fish Products that have been distributed or are under the custody and control of Defendants' agents, distributors, customers, or consumers;

3. Institute or re-implement any of the requirements set forth in this Decree; or

4. Take any other corrective actions as FDA deems necessary to protect the public health or bring Defendants into compliance with this Decree, FDA regulations, and the Act.

B. Any order issued by FDA pursuant to this paragraph shall specify the alleged violations giving rise to the order. Within seven (7) calendar days after receiving such order from FDA, Defendants shall notify FDA in writing that:

1. Defendants are undertaking or have undertaken the ordered action(s), in which event Defendants shall also describe the action taken and specify the time frame in which the action will be completed; or

2. Defendants disagree with FDA's order, in which case Defendants shall state in writing the reasons for the disagreement. In so doing, Defendants may propose specific alternative actions and specific time frames for achieving FDA's objectives.

3. If Defendants notify FDA that they do not agree with FDA's order, FDA will review Defendants' objections, and thereafter, in writing, affirm, modify, or withdraw its order, as FDA deems appropriate;

4. If FDA affirms or modifies its order, Defendants shall, within fourteen (14) calendar days of receipt of this order, implement the order (as modified, if applicable) and, if they so choose, bring the matter before this Court on an expedited basis;

5. Any matter brought before this Court pursuant to this paragraph shall be based exclusively on the record before FDA at the time the order in dispute was issued pursuant to subparagraph D. No discovery shall be taken by either party; and

C. All costs of recall(s) and corrective actions ordered by FDA pursuant to this paragraph shall be borne by Defendants. The costs of FDA inspections, sampling, testing, document preparation and review time, travel time, and subsistence expenses to implement the remedies set forth in this paragraph shall be borne by Defendants at the rates specified in paragraph 16. This provision shall be separate and apart from, and in addition to, all other remedies available to FDA.

14. Any cessation of operations or other corrective actions as described in paragraph 13 shall be implemented immediately and continue until Defendants receive written notification from FDA

that Defendants appear to be in compliance with the Act, FDA regulations, and this Decree or until order of this Court in a proceeding brought pursuant to paragraph 13(B)(4).

15.  If any Defendant(s) fails to comply with any of the provisions of this Decree, then Defendant(s) shall pay to the United States of America liquidated damages in the sum of one thousand five hundred dollars ($1,500) for each day the Defendant(s) fails to comply with this Decree and an additional sum of five hundred dollars ($500) in liquidated damages per day for each violation of the Act, its implementing regulations, and/or this Decree.  In addition, should any Defendant(s) distribute any adulterated Scombrotoxin Fish Products, such Defendant(s) shall, in addition to the foregoing, pay to the United States as liquidated damages a sum equal to twice the retail value of such Scombrotoxin Fish Products.  Defendants understand and agree that the liquidated damages specified in this paragraph are not punitive in nature and their imposition does not in any way limit the ability of the United States to seek, or the power of the Court to impose, additional civil or criminal penalties to be paid by Defendants, or remedies based on conduct that may also be the basis for payment of liquidated damages pursuant to this paragraph.

16.  Defendants shall pay the costs of FDA's supervision, inspection, analysis, review, and examination conducted pursuant

to this Decree at the standard rates prevailing at the time the activities are accomplished and Defendants shall make payment in full to FDA within thirty (30) days of receiving written notification from FDA of the costs. As of the date of entry of this Decree, these rates are: $87.57 per hour and fraction thereof per representative for inspection and supervision work other than laboratory and analytical work; $104.96 per hour and fraction thereof per person for laboratory and analytical work; $0.50 per mile for travel by automobile; the government rate or equivalent for travel by air; and the published government per diem rate, or the equivalent, for the areas in which the inspections are performed, per representative for subsistence expenses, where necessary. In the event that the standard rates generally applicable to the FDA supervision of court-ordered compliance are modified, these rates shall be increased or decreased without further order of the Court.

17. Should the United States bring, and prevail in, a contempt action to enforce the terms of this Decree, Defendants shall, in addition to other remedies, reimburse the United States for its reasonable attorneys' fees, investigational expenses, expert witness fees, travel expenses incurred by attorneys and witnesses, and administrative court costs relating to such contempt proceedings.

18.   Defendants shall notify in writing the FDA New Orleans District Director, at the address specified in paragraph 19 of this Decree, at least twenty (20) calendar days before any change in ownership or character of their business such as dissolution, assignment, bankruptcy, or sale resulting in emergence of a successor corporation, the creation or dissolution of subsidiaries, or any other change in the corporate structure of Sharkco, or the sale or assignment of any business assets, such as buildings, equipment, or inventory, that may affect compliance with this Decree.  Defendants shall provide a copy of this Decree to any proposed successor or assignee at least thirty (30) calendar days prior to making any assignment or transferring any interest in the company as described in this paragraph. Defendants shall furnish FDA with an affidavit of compliance with this paragraph no later than fifteen (15) calendar days prior to such assignment or change in ownership.

19.   All notifications, correspondence, and communications to FDA required by the terms of this Decree shall be submitted to the Director, FDA New Orleans District Office, 404 BNA Drive, Building 200, Suite 500, Nashville, TN 37217.

20.   Defendants shall abide by the decisions of FDA, which decisions shall be final.  FDA decisions under this Decree shall be reviewed by the Court, if contested, under the arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A).  Review

shall be based exclusively on the written record before FDA at the time the decision was made. No discovery shall be taken by either party.

21. This Court retains jurisdiction of this action and the parties hereto for the purpose of enforcing and modifying this Decree and for the purpose of granting such additional relief as may be necessary and appropriate.

SO ORDERED:

Dated this __22nd__ day of _____September_____ , 2010.

_____
UNITED STATES DISTRICT JUDGE

We hereby consent to the entry of the foregoing Decree:

FOR DEFENDANTS

_____
TUAN Q. NGUYEN
Individually and as Co-owner
of Sharkco Seafood
International, Inc.

_____
KHAI Q. NGUYEN
Individually and as Co-owner
of Sharkco Seafood
International, Inc.

_____
PAUL N. VANCE, Bar No. 13007
JENA W. SMITH, Bar No. 25255
BALDWIN HASPEL BURKE & MAYER,
LLC
2200 Energy Centre
1100 Poydras Street
New Orleans, LA 70163
Telephone: (504) 569-2900
Attorneys for Sharkco Seafood
International, Inc., Tuan Q.
Nguyen, and Khai Q. Nguyen

FOR PLAINTIFF

JIM LETTEN
United States Attorney

BY:
_____
SHARON D. SMITH, Bar No.
17146
Assistant United States
Attorney

DAVID SULLIVAN
Office of Consumer Litigation
Department of Justice,
Civil Division
P.O. Box 386
Washington, DC 20044
Telephone: (202) 616-0295

OF COUNSEL:

MARK B. CHILDRESS
Acting General Counsel

RALPH S. TYLER
Chief Counsel
Food and Drug Division

ERIC M. BLUMBERG
Deputy Chief Counsel, for
Litigation

MELISSA J. MENDOZA
Assistant Chief Counsel
for Enforcement
U.S. Department of Health and
Human Services
Office of the General Counsel

- 17 -

**Firm Name:** Sharkco Seafood International, Inc.

**Firm Address:** 707 Jump Basin Road
Venice, LA 70091

**Product Description:** Amberjack, King Mackerel, Tuna, Mahi Mahi, Wahoo and Blue Runner
**Method of Storage and Distribution:** Iced in cooler; shipped to processors

**Intended Use and Consumer:** Cooked before consumption by general public

| (1) Critical Control Point (CCP) | (2) Significant Hazard(s) | (3) Critical Limits for each Preventive Measure | (4) Monitoring What | (5) Monitoring How | (6) Frequency | (7) Who | (8) Corrective Action(s) | (9) Records | (10) Verification |
|---|---|---|---|---|---|---|---|---|---|
| Receiving amberjack, king mackerel, tuna, mahi mahi, wahoo and blue runner from harvesting vessels | Scombrotoxin (histamine) formation | All lots received by harvest vessel records show: 1) chilling on board the harvest vessel was performed within 6 hrs. of death if the maximum exposure temperature was >83 °F and the 2) capture method; 3) date and time of landing; 4) date and time of evisceration 5) cooling method; 6) date and time cooling started; and 7) sea and air temperature . At ambient temperature < 83 °F, chilling was begun within 12 hours. | Harvest vessel records | Visual review and obtain copy | Every lot received | Receiving supervisor or designated employee | If amount of ice is inadequate, and/or records are inadequate; or > 2.5% decomposition, then Reject lot Discontinue use of supplier until evidence is obtained that handling and/or recordkeeping practices have changed | Harvester vessel records  Receiving record (includes adequacy of ice surrounding fish; sensory evaluation; and core temperature measurements)  Corrective action record  Verification records | Histamine analysis on one incoming lot of of an individual species every three months (18 fish per sample)  Review monitoring, corrective action and verification records within one week of preparation |
| | | No more than 2.5% decomposition (persistent and readily perceptible) in the incoming lot of a given species | Amount of decomposition in incoming lot. | Sensory examination for odors indicative of decomposition of entire lot (up to 118 fish) for every species received. | | | | | |
| | | Ice completely surrounds product at time of delivery | Adequacy of ice at time of delivery and internal temperature check | Visual examination and results of internal temperature check using digital thermometer as described below | | | | | Check accuracy of digital thermometer once per day and calibrate annually. |
| | | If the fish are delivered: a) in less than 12 hours after death and the internal temperature is less than ambient air and water temperature; b) 12 or more hours after death, an internal temperature of 50°F or below; c) if the fish are delivered 24 or more hours after death, an internal temperature of 40°F or below | Internal temperature of individual species | Using digital thermometer measure  internal temperature (two fish per ton if lot of species is less than 10 tons; minimum of 12 fish per lot of a species) | | | | | |

tabbles®

EXHIBIT

A

Sharkco Seafood International, Inc.

| (1) Critical Control Point (CCP) | (2) Significant Hazard(s) | (3) Critical Limits for each Preventive Measure | (4) What | (5) Monitoring How | (6) Frequency | (7) Who | (8) Corrective Action(s) | (9) Records | (10) Verification |
|---|---|---|---|---|---|---|---|---|---|
| Receiving | Environmental Chemical Contaminants (Oil Spill Related Contaminants) | No fish may be harvested from an area that is covered by a Local, State or Federal closure, or for which there is information from other authoritative sources that there is a current problem. | Identify harvest area | Ask fishermen for the harvest location | Every lot received | Receiving employee | If the incoming product has been harvested from a closed area, Then: Reject lot  Discontinue use of supplier until evidence is obtained that harvesting practices have changed. | Receiving Record (for example, a written affirmation by the supplier) Corrective action record | Review monitoring and corrective action and verification records within one week of preparation |
| Raw material storage | Scombrotoxin formation | Product completely covered in ice throughout storage | Adequacy of ice surrounding raw material in storage cooler | Visual examination | Every container in each lot, twice per day until material is shipped | Production supervisor or designated employee | If ice does not adequately surround the raw material in storage cooler, Then: Add ice to the product  Hold fish for histamine testing; if values exceed 50 ppm, destroy the lot.  Conduct study to determine the depth of ice over product necessary to maintain product at the desired temperature. | Cold storage record Corrective action records Verification records | Review monitoring, corrective action and verification records within one week of preparation Study to determine depth of ice adequate for overnight holding Check accuracy of the digital thermometer daily at beginning of operations and calibrate annually |

Signature of Company Official: _____  Date: _____

# Daily Sanitation Monitoring

## DAILY SANITATION REPORT

Report Date:_____    Firm Name:_____

Product being processed:    Firm Address:_____

_____

| Sanitation Area and Goal | | Pre-Op Time: | Start Time: | 4 Hour Time: | 8 Hour Time: | Post-Op Time: | Comments / Corrections |
|---|---|---|---|---|---|---|---|
| **1) Safety of Water**<br>(See Monthly Sanitation Report) | | | | | | | |
| Back Siphonage - Hoses | | (circle one)<br>**S / U** | | | | | |
| No standing water | | (circle one)<br>**S / U** | | (circle one)<br>**S / U** | | | |
| **2) Condition and cleanliness of food contact surfaces**<br>(See Monthly Sanitation Report) | | | | | | | |
| Equipment cleaned and sanitized | Line 1: | (circle one)<br>**S / U** | | | | | |
| Sanitizer Strength<br><br>Sanitizer Type:_Sodium hypochlorite____<br><br>Minimum Strength: 200__ ppm | Line 1: | ___ ppm | | | | | |
| Gloves and aprons clean and in good repair | Line 1: | (circle one)<br>**S / U** | | | | | |
| **3) Prevention of cross-contamination**<br>(See Monthly Sanitation Report) | | | | | | | |
| Hands, gloves, equipment, and utensils washed / sanitized after contact with unsanitary objects | | | (circle one)<br>**S / U** | (circle one)<br>**S / U** | (circle one)<br>**S / U** | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Coolers are clean and in good working order | **S / U** | | | | | |
| Waste is removed each 4 hours | (circle one) **S / U** | | (circle one) **S / U** | | | |
| Grounds are maintained | (circle one) **S / U** | | | | | |

**4) Maintenance of hand-washing, hand-sanitizing, and toilet facilities**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Hand-wash and hand-sanitizing stations adequate | | | | | | | |
| Hand-wash station | Line 1: | (circle one) **S / U** | | | | | |
| Hand-sanitizing station  Sanitizer Type: __Iodophor__  Minimum Strength: _25_ ppm | Line 1: | ___ ppm | | ___ ppm | ___ ppm | | |
| Toilets clean, properly functioning, and adequately supplied | (circle one) **S / U** | | | | | |

**5) Protection from adulterants and 6) Labeling, storage, and use of toxic compounds**

| | | | | | | |
|---|---|---|---|---|---|---|
| Product protected from contamination | | (circle one) **S / U** | (circle one) **S / U** | (circle one) **S / U** | | |
| Cleaning compounds, lubricants, and pesticides labeled and stored properly | (circle one) **S / U** | | | | | |

**7) Employee health conditions**

| | | | | | | |
|---|---|---|---|---|---|---|
| Employees do not show signs of medical problems | (circle one) **S / U** | | | | | |

**8) Exclusion of Pests**

| | | | | | | |
|---|---|---|---|---|---|---|
| Pests excluded from processing area | (circle one) **S / U** | | | | | |
| Other area(s) | | | | | | |

Additional Comments:

S = Satisfactory
U = Unsatisfactory

Initials: _____

Reviewed by:                                    Date:

Source: U.S. FDA/CFSAN Office of Field Programs.  2002.  Juice HACCP Regulator Training.
Cited April 9, 2005.  http://www.cfsan.fda.gov/~comm/juiceman.html
Modified: 08.22.2010

# Sanitation Standard Operating Procedures

*Sharkco Seafood International, Inc.*
*707 Jump Basin Road*
*Venice, LA 70091*
*June 19, 2010*

Adapted from the Seafood HACCP Alliance Model Plan

---

## 1. SAFETY OF THE WATER THAT COMES INTO CONTACT WITH FOOD OR FOOD-CONTACT SURFACES, OR IS USED IN THE MANUFACTURE OF ICE.

### Control Measures

All water used in the plant is from a reliable municipal water system. The water system in the plant was designed and installed by a licensed plumbing contractor, and meets current community building codes. All modifications to the plumbing system will be completed by a licensed plumbing contractor and will be inspected to ensure conformance with local building codes. All hoses inside and outside the plant have anti-siphoning devices installed.

### Monitoring Procedures

The municipal water district routinely monitors the water to ensure that it meets state and federal water quality standards. The quality assurance supervisor receives and reviews annual reports of municipal water quality.

Twice a year, and when modifications are made to the plumbing system, water samples from at least two locations in the plant are sent to a private testing laboratory and examined for the presence of coliforms. Cultures testing positive for coliforms are examined for the presence of fecal coliforms. The plant manager receives and reviews the laboratory reports.

Hoses are inspected daily during production for the presence of anti-siphoning devices. Processing area floors are inspected daily during production for adequate drainage.

### Corrective Actions

In the event of municipal water treatment failure, the plant will stop production, determine when the failure occurred, and embargo all products produced during the failure until product safety can be assured. Production will resume only when water meets state and federal water quality standards.

If in-plant sampling indicates the presence of coliforms in more than 5% of plant water samples, the plant will contact the municipal water system and inspect the plumbing system to determine the source of the coliforms. Corrections will be made to the plumbing system, if necessary, to correct problems.

If in-plant sampling indicates the presence of fecal coliforms in any plant water sample, the plant will stop production and embargo all products until product safety can be assured. The plant will contact the municipal water system and inspect the plumbing system to determine the source of the fecal coliforms. Corrections will be made to the plumbing system, if necessary, to correct problems. Production will resume only when water meets state and federal water quality standards.

Hoses without anti-siphoning devices will be red-tagged and will not be used until anti-siphoning devices have been installed. Floors with standing water will have the drains unplugged, or, if necessary, consultations will be held with plumbing or general contractors and corrections will be made to correct floor drainage problems.

**Record Keeping**

Reports are kept for municipal water quality, in-plant water quality testing, and corrective actions. Hose inspections, floor drainage inspections, and corrective actions are recorded on the Daily Sanitation Report.

2. **CONDITION AND CLEANLINESS OF FOOD CONTACT SURFACES, INCLUDING UTENSILS, GLOVES, AND OUTER GARMENTS.**

**Control Measures**

Food-contact surfaces are adequately cleanable.

Food-contact surfaces are cleaned and sanitized with Sodium Hypochlorite (200 ppm) twice each day during processing.

**In the morning before processing.** Food-contact surfaces are rinsed with cold water and sanitized.

**At the midday break.** Major solids are physically removed from floors, equipment, and food-contact surfaces. Equipment is disassembled as required for adequate cleaning. All surfaces are rinsed with cold water. Equipment and food-contact surfaces are scrubbed using brushes with a cleaner in warm (120°F) water. All surfaces and floors are rinsed with cold water. Food-contact surfaces are sprayed with the sanitizer solution. Floors are sanitized. Utensils are cleaned, rinsed in hot water (190°F), sanitized, and rinsed in hot water (190°F) prior to use.

**At the end of the shift.** Major solids are physically removed from floors, equipment, and food-contact surfaces. Equipment is disassembled as required for adequate cleaning. All surfaces are rinsed with cold water. Equipment and food-contact surfaces are scrubbed using a cleaner in warm (120°F) water. All surfaces and floors are rinsed with cold water. Utensils are cleaned, rinsed in hot water (190°F), sanitized, and air-dried.

Workers working with raw products wear clean gloves, waterproof aprons and waterproof boots. Waterproof aprons may be single use and disposable. Re-usable aprons are cleaned and sanitized twice each day, at the midday break and at the end of the shift.

## Monitoring Procedures

The plant manager inspects food-contact surfaces to determine if they are adequately cleanable and are clean and sanitized before processing begins and after each clean-up period. The plant manager monitors the use of gloves and the cleanliness of workers outer garments.

## Corrective Actions

Food-contact surfaces that are not adequately cleanable are repaired or replaced. Food-contact surfaces that are not clean are re-cleaned. Gloves that become a potential source of contamination are cleaned and sanitized or replaced. Disposable gloves may be used. Outer garments that become a potential source of contamination are cleaned and sanitized or replaced.

## Record Keeping

Condition of food-contact surfaces, sanitation inspections, use and cleanliness of gloves, cleanliness of worker outer garments, and corrective actions are noted on the Daily Sanitation Report.

## Control Measures

The plant manager has received basic food sanitation training. Workers wear hairnets, headbands, caps, beard covers, or other effective hair restraints and do not wear jewelry or other objects that might fall into the product, equipment, or containers. Workers wear disposable gloves and replaced them as needed. Workers wash their hands and gloves thoroughly and sanitize them using Iodophor (25 ppm) dips before starting work, after each absence from their workstation, and anytime they have become soiled or contaminated.

Clothing and personal belongings are not stored in production areas. Workers do not eat food, chew gum, drink beverages, or use tobacco in production areas.

Plant grounds are in a condition that protects against contamination of food. Waste is removed from processing areas every 4 hours during production.

Plant buildings are maintained in good repair. Drip or condensate does not contaminate food or packaging materials. Safety-type light fixtures are used in processing and packaging areas. Coolers, including the evaporators, are cleaned annually or more often if needed. Nonfood-contact surfaces in processing and packaging areas are cleaned daily at the end of the shift.

Raw Packaging materials are protected from contamination during storage.

## Monitoring Procedures

Plant manager schedules basic food sanitation courses for new production supervisors.

Plant manager or designated employee monitors hair restraint use, glove use, hand washing, personal belonging storage, eating and drinking in processing areas, and boot sanitizing.

Plant manager or designated employee monitors use of proper sanitation equipment and removal of waste from processing areas.

Plant manager or designated employee inspects plant and coolers before processing begins and inspects packaging material storage area and plant grounds daily.

## Corrective Actions

New employees receive basic sanitation instruction.

Workers correct deficiencies in hair restraint use, glove use, hand washing, personal belonging storage, eating and drinking in processing areas, and boot sanitizing before working with raw or cooked products.

Sanitation equipment that is being used in the wrong plant area is cleaned and sanitized and exchanged for correct equipment. Sanitation supervisor initiates correction of any potentially contaminating condition.

## Record Keeping

Training records indicate that production supervisors have received basic food sanitation training.

Hair restraint use, glove use, hand washing, use of proper sanitation equipment, plant grounds and waste inspections, plant and cooler inspections, packaging material storage inspections, and corrective actions are noted on the Daily Sanitation Report.

3. **MAINTENANCE OF HAND WASHING, HAND SANITIZING, AND TOILET FACILITIES.**

### Control Measures

Toilet facilities are provided off the worker's dressing room, physically separated from processing areas. Toilet facilities have self-closing doors, are maintained in good repair, and are cleaned and sanitized daily at the end of the shift.

Hand washing facilities are provided in raw and cooked processing areas and in the toilet facility. Hand washing facilities have: hot and cold running water; liquid sanitizing hand soap; hand sanitizer solutions 25 ppm Iodophor) that are changed every 4 hours during production; sanitary towel service; Signs directing workers to wash their hands and gloves thoroughly and sanitize them before starting work, after each absence from their workstation, and anytime they have become soiled or contaminated; and covered refuse receptacles.

### Monitoring Procedures

Plant manager or designated employee inspects the toilet facilities and hand-washing facilities daily.

### Corrective Actions

Plant manager or designated employee initiates cleaning of dirty toilet facilities and correction of any potentially contaminating condition. Repairs are made as needed.

### Record Keeping

Inspections of toilet and hand washing facilities and corrective actions are noted on the Daily Sanitation Report.

4. **PROTECTION OF FOOD, FOOD-PACKAGING MATERIAL, AND FOOD-CONTACT SURFACES FROM ADULTERATION WITH LUBRICANTS, FUEL, PESTICIDES, CLEANING COMPOUNDS, SANITIZING AGENTS, CONDENSATE, AND OTHER CHEMICAL, PHYSICAL, AND BIOLOGICAL CONTAMINANTS.**

### Control Measures

Cleaning compounds, sanitizers and lubricants used in processing and packaging areas are listed in the U.S. Department of Agriculture, Food Safety and Inspection Service's "List of Proprietary Substances and Nonfood Compounds Authorized for use under USDA Inspection and Grading Programs" (FSIS Miscellaneous Publication No. 1419). Food-grade and non-food-grade chemicals and lubricants are stored separately outside

processing and packaging areas. Food, food-packaging materials and food-contact surfaces are protected from adulteration from biological, chemical and physical contaminants.

**Monitoring Procedures**

Invoices are checked at receiving before chemicals are stored in the food-grade chemical storage area. Sanitation supervisor inspects chemical storage areas daily and inspects processing and packaging areas daily before production begins.

**Corrective Actions**

Unapproved chemicals are returned or used in non-processing areas. Improperly stored chemicals are moved to the correct storage area. Sanitation supervisor initiates correction of any potentially contaminating condition. Repairs are made as needed.

**Record Keeping**

Invoices are kept for food-grade chemicals and lubricants. Chemical storage area, processing and packaging area inspections and corrective actions are noted on the Daily Sanitation Report.

## 5. LABELING, STORAGE, AND USE OF TOXIC COMPOUNDS.

Cleaning compounds, sanitizing agents, lubricants, and pesticide chemicals are properly labeled and are stored outside processing and packaging areas and separately from packaging materials. Food-grade chemicals and lubricants are stored separately from non-food-grade chemicals and lubricants.

**Monitoring Procedures**

Plant manager or designated employee inspects chemical storage areas daily.

**Corrective Actions**

Unlabeled chemicals are removed from storage areas and properly disposed. Improperly stored chemicals are moved to correct storage areas.

**Record Keeping**

Chemical storage area inspections and corrective actions are noted on the Daily Sanitation Report.

6. **CONTROL OF EMPLOYEE HEALTH CONDITIONS THAT COULD RESULT IN THE MICROBIOLOGICAL CONTAMINATION OF FOOD, FOOD-PACKAGING MATERIALS, AND FOOD-CONTACT SURFACES.**

### Control Measures

Workers are instructed to report to their immediate supervisor any health condition that might result in food contamination.

### Monitoring Procedures

Supervisors report suspected health problems to the plant manager. The plant manager decides if a potential food contamination situation exists.

### Corrective Actions

Workers who represent a potential risk are sent home or reassigned to non-food-contact jobs.

### Record Keeping

Worker health and corrective actions are noted on the Daily Sanitation Report.

7. **EXCLUSION OF PESTS FROM THE FOOD PLANT.**

### Control Measures

Plant grounds and interior areas are kept free of litter, waste, and other conditions that might attract pests. Cooler and ice machine doors are kept closed. No pets are allowed in the plant. Employees report any pest problems to the plant manager.

### Monitoring Procedures

The plant manager reviews reports of pest treatment. The plant manager or designated employee inspects the plant's exterior and interior daily.

### Corrective Actions

A licensed pest management firm is notified of any pest problem and treats the problem. Pest treatments are more frequent if problems are identified.

**Record Keeping**

Records of pest treatment. Plant inspections and corrective actions are noted on the Daily Sanitation Report.

Revised: 11/20/98; 06/18/2010; 08/22/2010
Reviewed by (Plant Manager):
Date:

## Appendix I.
## SSOP Records

1. Municipal water quality reports and corrective actions are reviewed and kept on file for two years.
2. In-plant water quality testing and corrective actions are reviewed and kept on file for two years.
3. Daily Sanitation Reports are reviewed and kept on file for two years.
4. Invoices for food-grade chemicals and lubricants are reviewed and kept on file for two years.
5. Records of pest treatment are reviewed and kept on file for two years.

Revised: 11/20/98; 6/18/2010
Reviewed by (Plant Manager):
Date:
_____

The authors are (the late) Robert J. Price, Extension Specialist, Seafood Products, Food Science & Technology, University of California, Davis, and Kenneth S. Hilderbrand Jr., Seafood Processing Specialist, Oregon Extension Sea Grant Program

UCSGEP 98-3W; November 1998